**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PHILLIP X. PULLEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:26-cv-80 |
| | ) | |
| vs | ) | |
| | ) | Magistrate Judge Patricia L. Dodge |
| ELISAR ADMON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Phillip X. Pulley ("Pulley"), a prisoner who is incarcerated by the Pennsylvania Department of Corrections ("DOC") at the State Correctional Institution at Fayette, Pennsylvania ("SCI Fayette"), brings this pro se civil rights action against multiple defendants. He raises claims of religious discrimination, equal protection, conspiracy and retaliation under the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985(3) and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc-5 ("RLUIPA"). The claims arise out of Pulley's efforts to organize and serve as the facilitator for the Muhammad Temple of Islam ("MTI") group of inmates at SCI Fayette.

Presently before the Court is Defendants' motion to dismiss the Complaint (ECF No. 9). For the reasons that follow, their motion will be granted in part and denied in part.[1]

## I. Procedural History

Pulley filed this Complaint on January 15, 2026 (ECF No. 1). Federal question jurisdiction is based on the civil rights claims asserted, 28 U.S.C. §§ 1331, 1343(a). He names as Defendants the following employees of SCI Fayette: Facility Chaplaincy Program Director Rabbi Elisar

[1] The parties have fully consented to full jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). (ECF Nos. 16, 17.)

Admon ("Rabbi Admon"); Chaplains Joshua Green ("Reverend Green") and David Luffy ("Reverend Luffy"); Corrections Classification Program Manager Debra Hawkinberry ("CCPM Hawkinberry"); School Principal Brittany Kimmel ("Principal Kimmel"); Deputy Superintendent of Centralized Services Martin Switzer ("DSCS Switzer"); Superintendent Tina Walker; Religious Service Administrator Ulrich Klem ("Reverend Klem"); and Chief Grievance Officer Kerri Moore.

The Complaint includes eight claims. In Count I, Pulley alleges that Rabbi Admon denied him the right to have a fellowship meal in celebration of the birth of Elijah Muhammad on the agreed-upon date in violation of the First Amendment and RLUIPA. Count II asserts that Rabbi Admon and Reverend Green denied Pulley the ability to break his fast at the proper time in retaliation for his exercise of religious rights in violation of the First Amendment. In Count III, Pulley claims that Rabbi Admon, Reverends Green and Klem and Grievance Officer Moore forced him to sign a Memorandum of Understanding ("MOU") that did not represent DOC policy, in violation of the First Amendment and in a conspiracy under § 1985(3). Count IV of the Complaint alleges that Rabbi Admon and Reverends Green and Luffy conspired and denied him access to a DVD series that other religious groups were allowed to view, in violation of the First Amendment, the equal protection clause and § 1985(3). In Count V, Pulley alleges that DSCS Switzer and Superintendent Walker conspired to deny his grievances in retaliation for his complaints, in violation of the First Amendment and § 1985(3). Pulley also asserts a claim in Count VI against Rabbi Admon and Reverends Green and Klem for prohibiting him from using Islamic prayer oil during services in violation of the First Amendment and RLUIPA. Count VII alleges that Principal Kimmel denied him educational services in violation of the First Amendment and RLUIPA. Finally, in Count VIII, Pulley claims that Rabbi Admon and Reverend Green conspired and treated

him and MTI differently than members of the Orthodox Muslim community with respect to breaking the fast times and the use of prayer oil in violation of the equal protection clause and § 1985(3).

On April 2, 2026, Defendants filed a motion to dismiss the Complaint (ECF No. 9), which has been fully briefed (ECF Nos. 10, 18).

## II. Facts Alleged in Complaint

### A. Denial of Ability to Serve as Facilitator

The Complaint alleges that, beginning in August of 2022, Pulley initiated the process of establishing an MTI religious service for men at SCI Fayette who wanted to "study the teachings of the Honorable Elijah Muhammad the Messenger of Allah." (Compl. ¶ 14.) He submitted the required forms twice, but Rabbi Admon told him they were "misplaced" each time and informed Pulley that he was not the facilitator of the group. (*Id.* ¶¶ 16-28.) Pulley notes that Sister Zakiyah Karim, Secretary for Muhammad Temple of Islam in Detroit, contacted the assistant to Reverend Klem to complain about the delays and indicate that, from their perspective, Pulley was the designated minister for MTI at SCI Fayette and was qualified to instruct the men until an outside facilitator could be found. (*Id.* ¶¶ 33-35.)

On December 9, 2022, MTI was authorized by the Department of Treatment Services to have religious services at SCI Fayette, but Rabbi Admon continued to tell Pulley that he was not the facilitator of the group, despite being shown a letter from the Temple in Detroit. (*Id.* ¶¶ 37-41.) For months, Pulley continued to ask Rabbi Admon and Reverends Green and Luffy about the matter, but Admon would say "you are not the facilitator," Green would say "I'm only following orders" and Luffy would say "Talk to Rabbi Admon. He is handling that." (*Id.* ¶¶ 44-46.)

On March 30, 2023, Pulley learned that Kelin Coleman had been appointed as inmate facilitator, but Coleman was not qualified and he soon requested that he be removed and that Pulley be made inmate facilitator, but Rabbi Admon refused. (*Id.* ¶¶ 47-50.) Pulley asked both CCPM Hawkinberry and Rabbi Admon why they were against his appointment and they said, "We have our reasons." (*Id.* ¶¶ 55-56.)[2]

B. Rescheduling of Fellowship Meal

The birthdate of Elijah Muhammad fell on October 7, 2023 and Rabbi Admon had agreed to allow MTI to commemorate the occasion with a fellowship meal. The meal was moved to October 9 because of a staff shortage, but after the attack on Israel by Hamas on October 7, Rabbi Admon refused to acknowledge the October 9 date. Instead, he scheduled the fellowship meal for October 16, the date on which the Nation of Islam ("NOI") commemorates the Day of Atonement/Million Man March but is not an MTI holy day. When Pulley questioned Rabbi Admon about this, he stated that, "It didn't matter, you are all the same." When Pulley provided evidence that the groups are not the same, Rabbi Admon told him he could commemorate the day in his cell if he didn't want to participate on October 16. Pulley filed a grievance about this matter. (*Id.* ¶¶ 58-68 & Ex. B.)

C. Increased Security Restrictions

Rabbi Admon had Security Captain Rusnak institute tighter restrictions on the predominantly Black faith groups at SCI Fayette under the guise of preventing antisemitic activity, even though the Islamic community stood in solidarity with the Jewish community after October 7, as it had following the attack at Tree of Life Synagogue on October 27, 2018. Correctional

[2] As explained below, despite this factual background, the Complaint does not actually contain a claim arising out of Rabbi Admon's opposition to Pulley serving as the MTI inmate facilitator, a position he eventually was allowed to assume.

officers were placed on a walkway and Black faith groups were forced to walk through a gauntlet on their way to and from services. Pulley and two other inmates (a Hebrew Israelite and an Orthodox Muslim) arranged a meeting with CCPM Hawkinberry, who acknowledged "off the record" that Rabbi Admon had instituted racial and religious discriminatory policies but stated "that there was nothing she could do about [Rabbi] Admon because he had been selected by those at the top." She said she would deny having said anything if asked. (*Id.* ¶¶ 69-75.)[3]

Pulley complained further about not being made inmate facilitator and CCPM Hawkinberry agreed to place him in this role and stated that she would inform Rabbi Admon of this decision. On November 2, 2023, Pulley was summoned to the chapel by Rabbi Admon, who stated that he had changed his mind and would no longer oppose Pulley being the inmate facilitator. He then asked Pulley to rescind his grievance about the issue, but Pulley refused. DSCS Switzer improperly denied the grievance on November 4, 2023 and Superintendent Walker subsequently "acquiesced in the fraudulent conduct and determined the actions of response of DSCS Switzer would be upheld." (*Id.* ¶¶ 76-89 & Ex. B.)

D. Denial of Breaking the Fast at the Proper Time

Pulley further alleges that, in retaliation for his refusal to withdraw the grievance and due to their racial and religious animosity toward MTI, Rabbi Admon and Reverend Green refused to schedule the breaking of the fast in the month of December at the setting of the sun, even though they allowed the Orthodox Muslim community to observe the breaking of the fast during the month of Ramadan at the setting of the sun. Pulley filed a grievance about this matter. (*Id.* ¶¶ 90-94.)

[3] Pulley has attached to his Complaint declarations from these inmates that support his version of the meeting. (ECF Nos. 1-1, 1-3.)

Rabbi Admon further forced MTI and NOI to share the same space for communal prayer during the December fast because he refused to recognize that they are separate sects of Islam that follow different rules. Pulley filed a grievance about this matter. (*Id.* ¶¶ 95-96.)

E. Pulley Forced to Sign MOU

Pulley was forced to sign an MOU that was generated by Reverend Klem and presented to him by Reverend Green as "Official DOC policy," even though it was not. Because Pulley was told that if he did not sign the document, he would be removed as inmate facilitator, he signed it under duress. He submitted a grievance about this matter. (*Id.* ¶¶ 97-101, 104.) Chief Grievance Officer Moore acknowledged that the MOU "awaits formal adoption into policy" but "deliberately chose to be indifferent to the fraud and deception perpetuated by [Reverend] Klem, [Rabbi] Admon, and Reverend Green and acquiesced to the violation of [Pulley's] right to religious freedom." (*Id.* ¶¶ 102-03.)

F. Hidden Colors DVD Series

In preparation for the May 30, 2024 religious service for MTI, Pulley discovered that a DVD series called "Hidden Colors" was missing. Reverend Green told him that the series had no significant religious connection to MTI study, so it had been confiscated. Reverend Green told Pulley that he, Rabbi Admon and Reverend Luffy had decided that the content of the series was "racially inflammatory and not relevant to the theology of MTI." Reverend Luffy indicated that the DVDs "depicted the white man in a bad light, was inflammatory in nature and made him uncomfortable." (*Id.* ¶¶ 105-09.)

Pulley told Reverend Luffy and Rabbi Admon that they had no authority to censor or determine what MTI members could study. Moreover, Pulley notes that the NOI and the Nation of Gods and Earth (two other religious groups) are in possession of the series and watch it

regularly. Pulley filed a grievance about this matter. (*Id.* ¶¶ 112-17.)

G. Denial of Islamic Prayer Oil

In December 2025, Rabbi Admon, Reverend Green and Reverend Klem decided that MTI participants would no longer be allowed to use scented oil in their religious service as they had always done. Reverend Green told Pulley to show an adequate connection between the oil and his religious beliefs and Pulley referenced several sources in the Bible and Qu'ran, but Reverend Klem denied the request. Pulley filed a grievance about this issue. (*Id.* ¶¶ 118-21.)

H. Denial of Educational Opportunities

As part of his religious duty to educate himself, Pulley took classes in HVAC and carpentry. When he signed up for the electrical class, Principal Kimmel put him on a "waiting list" in 2021, but never took him off. Although she was cordial at first, after he filed grievances and complained about her co-workers, Principal Kimmel's attitude changed to that of retaliation. In 2025, when he inquired about the matter, she told him first that the instructor was retiring, then when a new instructor was hired, she told him other inmates did not have any vocational training so they were given preference over him. Principal Kimmel sarcastically told Pulley that if he wanted to be enrolled more quickly, he should move to Zone 4, where fewer inmates were interested in taking classes, but that would have resulted in him forfeiting his place on the "honor unit" and ended his ability to facilitate the MTI service in Zone 2. He filed a grievance about this matter. Nine months later, Principal Kimmel told him there were openings, but he still was not allowed to enroll in the electrical class. (*Id.* ¶¶ 123-40.)

I. Relief Sought

As relief, Pulley seeks declarations that these actions violated his rights under the First Amendment, § 1985(3) and RLUIPA. He also asks for an injunction that requires Rabbi Admon

and Reverend Klem to reinstate the use of Islamic prayer oil, schedules the breaking of the December fast at the setting of the sun, returns the Hidden Colors DVD series for MTI study, stops acts of retaliation against him for using the grievance process, rescinds the MOU and directs Principal Kimmel to place him in the electrical course.

In addition, he seeks compensatory damages of $100,000 for the deprivation of his constitutional and civil rights and punitive damages of $100,000 against each Defendant. (Compl. at 72-74.)

## III. <u>Standard of Review</u>

"Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "This requires a plaintiff to plead "sufficient factual matter to show that the claim is facially plausible," thus enabling "the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). While the complaint "does not need detailed factual allegations ... a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As noted by the Third Circuit in *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011), a 12(b)(6) inquiry includes identifying the elements of a claim, disregarding any allegations that are no more than conclusions and then reviewing the well-pleaded allegations of the complaint to evaluate whether the elements of the claim are sufficiently alleged.

"A document filed *pro se* is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation and quotation marks omitted); *see also Higgs v. Attorney Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) ("The obligation to liberally construe a pro se litigant's pleadings is well-established.").

In ruling on a Rule 12(b)(6) motion, courts generally consider only the complaint, exhibits attached thereto, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

## IV. Discussion

### A. Civil Rights Claims

Pulley brings his constitutional claims under 42 U.S.C. § 1983. To advance his § 1983 claims, he must establish that one or more of the Defendants, acting under color of state law, deprived him of a right secured by the United States Constitution. *See Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Pulley raises claims under the First Amendment which, as relevant here, prohibits state actors from violating his right to freely exercise his religion and to be free from retaliation for engaging in protected First Amendment activity. He has also brought two equal protection claims under the Fourteenth Amendment, which prohibits a state actor from denying "to any person within

its jurisdiction the equal protection of the laws."

Specifically, he contends that his right to the free exercise of religion has been impeded (Counts I, III, IV, VI and VII) and that, after he filed various grievances, some of the Defendants retaliated against him in various ways (Counts II, V, VII). He further alleges that he received unequal treatment with respect to the DVD series (Count IV) and with respect to Islamic issues including the scheduling of the breaking of the fast and the use of prayer oil (Count VIII).

1. Individual Involvement

Defendants contend that DSCS Switzer, Superintendent Walker, Chief Grievance Officer Moore, Reverend Klem and CCPM Hawkinberry should be dismissed because they are not alleged to have had any personal involvement in the events pleaded in the Complaint. Pulley argues in response that these individuals conspired to deprive him of his civil rights.

The Court of Appeals has held that individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Government Officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207.

There are three ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates. Liability may attach if the supervisor: (1) directed the subordinate to take the action in question; (2) had "knowledge of and acquiesced" in the subordinate's unconstitutional conduct, meaning the supervisor knew that his or her subordinate was violating the plaintiff's rights but failed to stop the subordinate from doing so; or (3) with deliberate indifference to the consequences, established and maintained a policy, practice or custom which

directly caused the violation. *See, e.g., A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); *Rode*, 845 F.2d at 1208. "'Failure to' claims—failure to train, failure to discipline, or, as in the case here, failure to supervise—are generally considered a subcategory of policy or practice liability." *Barkes v. First Correctional Med.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds*, 575 U.S. 822 (2015).

Here, the Complaint fails to adequately allege the personal involvement of certain Defendants. Defendants Switzer, Moore and Walker are alleged to have been involved only in denying Pulley's grievances and appeals therefrom. These allegations are insufficient to establish any liability on their part.

"It is . . . well established that the filing of a grievance is not sufficient to show the actual knowledge necessary for a defendant to be found personally involved in the alleged unlawful conduct." *Mearin v. Swartz*, 951 F. Supp. 2d 776, 782 (W.D. Pa. 2013). *See also Jefferson v. Wolfe*, 2006 WL 1947721, at *17 (W.D. Pa. July 11, 2006); *Watkins v. Horn*, 1997 WL 566080, at *4 (E.D. Pa. Sept. 5, 1997); *Seldon v. Wetzel*, 2020 WL 929950, at *4 (W.D. Pa. Feb. 6, 2020), *report and recommendation adopted*, 2020 WL 924046 (W.D. Pa. Feb. 26, 2020). "Courts have routinely dismissed civil rights allegations against prison officials whose only knowledge of the alleged violation stemmed from their participation in the grievance process." *Seldon v. Wetzel*, 2020 WL 929950, at *4 (W.D. Pa. Feb. 6, 2020), *report and recommendation adopted*, 2020 WL 924046 (W.D. Pa. Feb. 26, 2020). *See also Ramos v. Pennsylvania Dep't of Corr.*, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) ("It is well established that "the review and denial of the grievances and subsequent administrative appeal conducted does not establish personal involvement by those Defendants in the alleged underlying unconstitutional conduct.")

Therefore, Defendants Switzer, Moore and Walker will be dismissed. And because the only Defendants named in Count V are DSCS Switzer and Superintendent Walker, Count V will be dismissed as well. Because this failure cannot be remedied by amendment, the dismissal will be with prejudice and without leave to amend.

CCPM Hawkinberry is alleged to have initially opposed Pulley becoming the inmate facilitator for the MTI group, along with Rabbi Admon. However, the Complaint does not actually include a claim arising out of this allegation and CCPM Hawkinberry is not named as a defendant in any of the counts in the Complaint. Therefore, CCPM Hawkinberry will also be dismissed for lack of personal involvement.

On the other hand, Pulley identifies Reverend Klem, along with Rabbi Admon and Reverend Green, as a participant in the decision to deny him the use of Islamic prayer oil (Count VI). He is not named purely as a supervisor. Therefore, he will not be dismissed based on lack of personal involvement.

2. Official Capacity Claims

Pulley names all Defendants except Reverend Luffy and CCPM Hawkinberry in both their official and individual capacities.[4] Defendants argue that all claims asserted against Defendants in their official capacities must be dismissed based on Eleventh Amendment immunity. As explained above, Switzer, Walker and Moore will be dismissed based on lack of personal involvement. That leaves for resolution the official capacity claims against Defendants Admon, Kimmel, Green and Klem.

The Supreme Court has stated that, under the Eleventh Amendment, "federal jurisdiction over suits against unconsenting states was not contemplated by the Constitution when establishing

[4] Luffy and Hawkinberry are sued only in their individual capacities.

the judicial power of the United States." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) (internal citation omitted). The immunity applies not only to the state itself, but also to state agents and state instrumentalities. Thus, courts must examine the essential nature and effect of the proceeding, the nature of the entity created by state law or the issue of whether a money judgment against the instrumentality would be enforceable against the state to determine whether the instrumentality should be treated "as an arm of the state." *Regents of the Univ. of Calif. v. Doe*, 519 U.S. 425, 429-30 (1997).

The DOC is an arm of the state for Eleventh Amendment immunity purposes. *See Lavia v. Pennsylvania, Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000). In their official capacities, the individual defendants are state agents who are entitled to Eleventh Amendment immunity with respect to damage claims. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). *See also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989) (unless sued for injunctive relief, state officials in their official capacities are not "persons" for purposes of § 1983).

The Court of Appeals for the Third Circuit has held that Eleventh Amendment immunity is subject to three primary exceptions: (1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law, that is, the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed.714 (1908). *Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) (citation omitted). Pennsylvania has not consented to waive its Eleventh Amendment immunity to being sued in federal court. 42 Pa. C.S. § 8521(b); *Chittister v. Department of Cmty. & Econ. Dev.*, 226 F.3d 223, 227 (3d Cir. 2000). The Supreme Court also has held that § 1983 does not abrogate states' sovereign immunity. *Quern v. Jordan*, 440 U.S. 332, 339-46 (1979).

As for the *Ex parte Young* exception, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Service Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation omitted). In addition to monetary damages, Pulley also seeks injunctive relief to reinstate the use of prayer oil, schedule the breaking of the fast at the proper time, allow him access to the DVD series and allow him to take the electrical course. Defendants have not addressed these requests for relief. The Court concludes that the *Ex parte Young* exception applies to Pulley's requests for injunctive relief as they identify ongoing violations and seek prospective relief.

Thus, to the extent that the Complaint states § 1983 claims for injunctive relief against Rabbi Admon, Reverends Klem and Green and Principal Kimmel in their official capacities, the motion to dismiss will be denied.

3. <u>Compensatory Damages</u>

Pulley requests compensatory damages in his claims for relief. Defendants contend that under the Prison Litigation Reform Act (PLRA), he may not seek compensatory damages unless he has physical injuries.

Pursuant to the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a showing of physical injury." 42 U.S.C. § 1997e(e). See *Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003) (holding that the PLRA does not permit an inmate to recover Eighth Amendment compensatory damages for purely emotional trauma of fear of assault unaccompanied by any actual physical injury).

Because Pulley does not allege any physical injuries, the motion to dismiss will be granted with respect to his civil rights claims for compensatory damages.

4. Free Exercise Claims

Pulley alleges that Defendants violated his right to free exercise of his religion by denying him a fellowship meal on the proper date (Count I), forcing him to sign an MOU (Count III), denying him access to the DVD series (Count IV), denying him Islamic prayer oil (Count VI) and denying him educational services (Count VII).

Defendants move to dismiss Count I and Count III.[5] With respect to Count I, they contend that although Pulley complains of being denied fellowship meals, he admits that he was allowed to celebrate Savior's Day Feast on February 26, 2023 and the birthday of Muhammad on October 16, 2023. That is not Pulley's claim, however. Rather, he alleges that Rabbi Admon deliberately refused to permit him and the MTI group to observe Muhmmad's birthday on October 9, 2023 and rescheduled the fellowship meal for October 16, a date that had no meaning for Pulley and MTI. This was done, Pulley alleges, because Rabbi Admon believed that MTI and NOI were "all the same" despite having been told they were different sects with different observances.

These allegations state a claim.[6] As the Court of Appeals explains, in *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court found that:

> "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The Court listed four factors that are relevant in determining the reasonableness of a particular prison regulation: (1) there must be a "valid, rational connection" between the prison regulation and the legitimate, neutral governmental interest put forward to

[5] Defendants have not specifically addressed Counts IV, VI and VII.

[6] It is not clear whether Pulley intends to state a claim regarding the Savior's Day Feast on February 26, 2023. In the factual section of the Complaint, he states that the harm was that Rabbi Admon scheduled both MTI and NOI to share the same space and meal even though they are different groups, and that because MTI had no facilitator at that time, there was no one to address this issue. This incident is not mentioned in Count I, however.

> justify it; (2) whether the inmate has alternative means of exercising the right at issue; (3) the burden that the accommodation would impose on prison resources; and (4) whether any ready alternatives to the regulation exist that would fully accommodate the inmate's rights at de minimis cost to valid penological objectives.

*Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012) (citing *Turner*, 482 U.S. at 89).

Here, Defendants have not addressed the delay in the fellowship meal utilizing the *Turner* factors. In any event, a development of the record would be necessary to evaluate it. As Judge Lanzillo has noted:

> While a court may sometimes be in a position to apply the *Turner* factors based on the pleadings alone, often a factual record is necessary to assess whether the regulation or practice is reasonably related to legitimate penological interests. *See Ramirez v. Pugh*, 379 F.3d 122, 126–30 (3d Cir. 2004) (reversing grant of a motion to dismiss and remanding for development of the factual record). "The *Turner* analysis is exceedingly fact-intensive and does not lend itself to resolution on a motion to dismiss." *Enoch v. Perry*, 2020 WL 4057643, at *10 (W.D. Pa. July 20, 2020).

*Tootle v. Long*, 2021 WL 3610034, at *5 (W.D. Pa. July 19, 2021), *report and recommendation adopted*, 2021 WL 3603621 (W.D. Pa. Aug. 13, 2021).

Accepting Pulley's allegations as true, Rabbi Admon rescheduled the meal for improper reasons. Therefore, Count I will not be dismissed.

With respect to Count III, Defendants argue that Pulley has not articulated a claim. Specifically, although he challenges the requirement that he had to sign an MOU to remain the inmate facilitator of the MTI group, he does not argue that the MOU infringed on his free exercise rights, nor does he challenge the requirement to sign the MOU other than to contend that it was not an official policy of the prison.

Pulley has not explained how his First Amendment rights were violated with respect to the MOU. Even if the MOU was not official prison policy, that alone does not state a claim for violation of Pulley's free exercise of his religion. The Complaint does not identify the content of

the MOU or explain how signing it interfered with his free exercise rights.

Therefore, with respect to Count III, the motion to dismiss will be granted and this claim will be dismissed. Because the Court cannot conclude that Pulley would be unable to remedy this failure through amendment, however, the dismissal will be without prejudice and with leave to amend. With respect to the claims not addressed by Defendants in Counts IV, VI and VII, the motion to dismiss will be denied.

5. Retaliation Claims

Pulley alleges retaliation claims in Counts II, V and VII. However, as explained above, Count V will be dismissed because denying grievances (even for retaliatory reasons) does not rise to the level of a constitutional claim or impose liability on the Defendants who denied the grievances. This leaves Pulley's claim in Count II that Rabbi Admon and Reverend Green denied Pulley and MTI the right to break their fast at the proper time in December 2023 and again in December 2024 in retaliation for his having filed grievances, and his claim in Count VII[7] that Principal Kimmel retaliated against him after he filed grievances against Rabbi Admon and her friend, Sergeant Carlson.[8]

A retaliation claim requires allegations that (1) the plaintiff engaged in a constitutionally protected activity; (2) he suffered an adverse action by a state actor that was sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action. *See*

[7] Although Defendants have not moved to dismiss the retaliation claim in Count VII, the Court can screen it for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1).

[8] In Count VII, Pulley alleges that when Sergeant Carlson saw him holding a book written by Elijah Muhammad, he confiscated the book and delayed Pulley's medical appointment, although Carlson did not take the same actions against another inmate who was perusing a puzzle book. Pulley filed a grievance about this treatment. (Compl. ¶¶ 241-47.) However, he does not raise a claim based on this incident and Sergeant Carlson is not named as a defendant in this case.

*Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

Defendants do not dispute that Pulley meets the first element of a First Amendment retaliation claim in Counts II and VII. *See Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (filing grievances is conduct protected by the First Amendment). *See also Watson v. Rozum*, 834 F.3d 417, 423 (3d Cir. 2016) (retaliation against prisoner who requested form to file a grievance was similarly prohibited). They argue, however, that his claims are nonetheless deficient on several grounds.

As to Count II, Pulley alleges that Rabbi Admon and Reverend Green denied Pulley the ability to break his fast at the proper time in retaliation for his exercise of rights in violation of the First Amendment. Defendants contend that these actions are too remote from the protected activity in which he engaged to establish a causal link. They note that several weeks elapsed between November 2, 2023, when Pulley told Rabbi Admon that he refused to withdraw his grievance, and December 2023, when the breaking of the fast was improperly scheduled. Moreover, a year elapsed between November 2, 2023 and December 2024, the second time that the breaking of the fast was scheduled at an improper time.

The Court will not evaluate the timing of these adverse actions on a motion to dismiss. *See Conard v. Pennsylvania State Police*, 902 F.3d 178, 184 (3d Cir. 2018) (reversing district court's granting of a motion to dismiss a retaliation claim based on timing because, "to the extent that the Court found that causation could not be proven because of the passage of time between Conard's protected conduct, i.e., bringing her initial action, and the retaliation, that conclusion was premature at the motion to dismiss stage.") Therefore, the retaliation claim in Count II will not be dismissed at this stage based on the passage of time.

Pulley filed a grievance against Rabbi Admon for his denial of his exercise of religion and was then denied the ability to break his fast at the appropriate time. As a result, Pulley has stated a claim in Count II against Rabbi Admon for retaliation against him.

On the other hand, Pulley's retaliation claim against Reverend Green based on grievances Pulley filed against Rabbi Admon fails. *See Victor v. Lawler*, 2010 WL 5014555, at *5 (M.D. Pa. Dec.3, 2010) (the courts have rejected a retaliation claim against one defendant based on a grievance filed against another defendant); *Evans v. Rozum*, 2009 WL 5064490, at *22 (W.D. Pa. Dec.19, 2009) (holding that to the extent the grievances and pending lawsuit were not filed against the moving defendants, "there is no apparent reason why [the moving defendants] would want to retaliate against Plaintiff for filing a lawsuit against others"). Therefore, with respect to Count II, Reverend Green will be dismissed.

With respect to Count VII, Defendants contend that to the extent that Pulley is complaining about being placed on a waiting list for a class, these actions do not rise to the level of adverse actions and being listed in the wrong sect caused him no harm.[9]

Not being permitted to take educational classes is not a liberty interest protected by the First Amendment. Nonetheless, "[r]etaliation may be actionable, however, even when the retaliatory action does not involve a liberty interest." *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000). *See also Rauser*, 241 F.3d at 333 (holding that the relevant question in a retaliation case is not whether the prisoner had a "protected liberty interest in the privileges he was denied, but whether he was denied those privileges in retaliation for exercising a constitutional right.");

---

[9] While Pulley alleges that Rabbi Admon initially opposed his service as inmate facilitator for MTI, he was ultimately made an inmate facilitator. Thus, while Defendants address this issue, this claim is not asserted in the Complaint and Pulley does not mention it in his response to the motion to dismiss.

*McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (noting that alleged retaliatory conduct need only be more than *de minimis*).

Pulley alleges that as part of his religious duty to educate himself, he sought to take an electrical class, but Principal Kimmel blocked his ability to do so in retaliation for his filing of grievances about her conduct and about those of her friends. Thus, at this stage, Pulley has appropriately alleged a claim that Principal Kimmel retaliated against him.

However, for the same reasons discussed with respect to Reverend Green, Pulley cannot state a retaliation claim against Principal Kimmel based on grievances he filed against Sergeant Carlson. Therefore, with respect to Count VII, the retaliation claim against Principal Kimmel will be dismissed to the extent that it is based on Pulley's grievance against Sergeant Carlson, but not with respect to the grievance asserted against Kimmel (and the free exercise and RLUIPA claims remain).

6. Equal Protection Claims

Pulley alleges that Rabbi Admon and Reverends Green and Luffy denied him and MTI equal protection when they refused to allow them to have access to the Hidden Colors DVD series even though other religious groups were allowed to view the DVDs (Count IV). Further, Pulley claims that Rabbi Admon and Reverend Green denied him and MTI equal protection when they refused to allow them to use Islamic prayer oil and to observe the breaking of their fast at sunset even though other Muslim groups were allowed to observe these rituals (Count VIII).[10] Defendants have not directly addressed these claims, other than to contend that Pulley has not sufficiently

[10] In his response to the motion to dismiss, Pulley asserts that the equal protection claim relating to the use of prayer oil is part of Count VI (ECF No. 18 at 8), but this is inconsistent with the Complaint itself.

alleged conspiracies with respect to Count VIII.[11]

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Claims for equal protection violations are subject to differing levels of scrutiny depending on the status of the claimant. Statutes or actions that substantially burden a fundamental right or target a suspect class must be reviewed under "strict scrutiny," which means that in order to be valid, they must be narrowly tailored to serve a compelling governmental interest. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982); *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir. 2000).

Pulley's claims are based on religious practices being denied, and thus implicate a fundamental right. *See Hassan v. City of New York*, 804 F.3d 277, 301 (3d Cir. 2015) ("intentional discrimination based on religious affiliation must survive heightened equal-protection review.")

Accepting all allegations in the Complaint and its attachments as true, as the Court is required to do when resolving a motion to dismiss, Pulley's equal protection claims can be construed as based on receiving different and less favorable treatment because of his religious affiliation. Therefore, with respect to the equal protection claims in Counts IV and VIII, the motion to dismiss will be denied.

---

[11] Defendants argue that Pulley "claims he was retaliated against in the form of being treated differently from other religious sects, but did not specify what the specific adverse action was or what he [w]as being retaliated against for." (ECF No. 10 at 10-11) (citing Compl. ¶ 117.) However, in the following paragraphs of the Complaint, Pulley alleges that he and MTI were prohibited the use of Islamic prayer oil, which other groups were permitted to use. (Compl. ¶¶ 118-21.) Moreover, these citations are from the factual background section; in Count VIII, Pulley expressly describes his equal protection claim as relating to the use of prayer oil and the breaking of the fast. (Compl. ¶¶ 264-67.)

B. Section 1985(3) Claims

Pulley alleges that Defendants violated § 1985(3) when they forced him to sign the MOU (Count III), when they denied him access to the DVD series (Count IV), and when they denied him access to Islamic prayer oil and refused to allow MTI members to break their fast at the proper time (Count VIII).[12] Defendants move to dismiss Count VIII.

The Court of Appeals has held that, "in order to state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (citations omitted). "A conspiracy claim based upon § 1985(3) requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals." *Robinson v. McCorkle*, 462 F.2d 111, 113 (3d Cir. 1972) (citation omitted). *See also Armstrong v. Sch. Dist. of Philadelphia*, 597 F. Supp. 1309, 1313 (E.D. Pa. 1984) (the allegations should indicate "how, why, or when the alleged conspiracy came into existence, the identity of its members, or the methods by which it accomplished its goals.."); *Tindell v. Beard*, 351 F. App'x 591, 594 (3d Cir. 2009) ("bare conclusory allegations are insufficient to sustain a conspiracy claim.")

As Defendants observe, the conspiracy claims in Count VIII are insufficient because they merely allege conspiracies without supporting details. Moreover, the gist of the claim is that Rabbi Admon and Reverend Green were both involved in denying Pulley the use of prayer oil and the

[12] In addition, Pulley alleges that Switzer and Walker violated § 1985(3) when they conspired to deny his grievances (Count V) but, as explained above, these allegations do not state a claim against any defendant individually. Therefore, by definition, they do not state a conspiracy claim,

ability to break his fast at the proper time, not that they conspired to do so. The same analysis applies to the conspiracy claims in Counts III and IV. Therefore, with respect to these claims, the motion to dismiss will be granted.

C. RLUIPA Claims

Pulley alleges that Defendants violated his rights under RLUIPA when they denied him a fellowship meal on the proper date (Count I), denied him the use of Islamic prayer oil (Count VI) and denied him educational services (Count VII). As noted above, Pulley seeks declarations that these actions violated his rights under RLUIPA, an injunction that requires Rabbi Admon and Reverend Klem to reinstate the use of Islamic prayer oil, schedules the breaking of the December fast at the setting of the sun, stops acts of retaliation against him for using the grievance process, and directs Principal Kimmel to place him in the electrical course, and he seeks compensatory damages. Defendants move to dismiss portions of these claims.[13]

RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Thus, "RLUIPA does not permit a court to determine whether the belief or practice in

---

[13] Although Defendants' motion is styled as a motion to dismiss and not a partial motion to dismiss, a close reading of it indicates that they are not seeking dismissal of Pulley's RLUIPA claims for injunctive relief against them in their official capacities.

question is 'compelled by, or central to, a system of religious belief.'" *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007) (citations omitted).

Under RLUIPA, Pulley bears the initial burden of proving that the DOC's policy imposes a substantial burden on his religious exercise. *See Holt v. Hobbs*, 574 U.S. 352, 360 (2015). Then the burden shifts to the DOC to show that policy: "(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest." *Id.* at 362.

"For the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem*, 497 F.3d at 280 (footnote omitted). In this case, Pulley proceeds along the first prong.

The Court of Appeals has held that "RLUIPA does not permit an action against Defendants in their individual capacities. Pennsylvania, not Defendants, was the direct recipient of any federal funds." *Sharp v. Johnson*, 669 F.3d 144, 154 (3d Cir. 2012). Thus, "RLUIPA does not allow for the recovery of money damages." *Banks v. Sec'y Pennsylvania Dep't of Corr.*, 601 F. App'x 101, 103 (3d Cir. 2015). *See also Small v. Wetzel*, 528 F. App'x 202, 208 (3d Cir. 2013) (RLUIPA does not allow for the recovery of compensatory damages, only injunctive and declaratory relief against a defendant in his official capacity). *Molina v. Little*, 2024 WL 3548453, at *4 (W.D. Pa. July 26, 2024). Therefore, all RLUIPA claims for monetary damages and claims against Defendants in their individual capacities will be dismissed.

Defendants are not seeking to dismiss Pulley's claims for injunctive relief. Even if their motion could be construed as seeking full dismissal of this claim, however, their motion will be denied because Pulley has sufficiently alleged that Defendants substantially burdened his religious exercise by denying him the right to break the fast at the proper time, denying him Islamic prayer oil and preventing him from taking educational classes.

D. Allowing Amendment

The Court of Appeals has held that "district courts must offer amendment—irrespective of whether it is requested—when dismissing a [pro se civil rights] case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). *See also Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004). In this case, it would be futile to allow amendment of the claims relating to the denial of grievances and conspiracies.

On the other hand, while the First Amendment claim in Count III is deficient, the Court cannot conclude that it would be futile to allow amendment.

## V. Conclusion

For all of these reasons, Defendants' Motion to Dismiss (ECF No. 9) will be granted in part and denied in part. Defendants' motion to dismiss will be granted in the following respects:

1. Defendants Switzer, Moore, Walker and Hawkinberry are dismissed with prejudice.
2. The claim against Reverend Green in Count II is dismissed with prejudice.
3. All § 1985(3) claims (in Counts III, IV, V and VIII) are dismissed with prejudice.
4. Count V is dismissed with prejudice.
5. The retaliation claim in Count VII is dismissed with prejudice as it relates to Principal Kimmel's retaliation against Pulley for his having filed grievances against others.

6. With respect to the RLUIPA claims in Counts I, VI and VII, the claims against Defendants in their individual capacities and all requests for monetary damages are dismissed with prejudice.
7. The First Amendment claim in Count III is dismissed without prejudice and with leave to amend.

In all other respects, the motion to dismiss is denied.

An appropriate order follows.

Date: September 4, 2026

/s/Patricia L. Dodge
PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

cc: PHILLIP X. PULLEY
AS 0590
SCI FAYETTE
50 Overlook Drive
LaBelle, PA 15450